[Cite as *Ohio Edison Co. v. Soule*, 2018-Ohio-4624.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

Ohio Edison Company                                Court of Appeals No. S-17-052

      Appellee                                        Trial Court No. 16 CVF 299

v.

Steven Soule                                       **DECISION AND JUDGMENT**

      Appellant                                       Decided:  November 16, 2018

* * * * *

Amanda Rasbach Yurechko, for appellee.

Mitchell M. Tallan and Lori E. Thomson, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Sandusky County Court, District No. 1, which granted the motion for summary judgment by the appellee and denied the cross-motion for summary judgment by the appellant.  For the reasons set forth below, this court affirms, in part, and reverses, in part, the judgment of the trial court.

**{¶ 2}** On September 21, 2016, plaintiff-appellee, Ohio Edison Company, filed a complaint against defendant-appellant, Steven Soule, setting forth claims of negligent vehicle operation on or about February 9, 2015, resulting in $6,607.25 in damages to appellee's facilities in Vickery, Ohio. Appellant generally denied the allegations. Following a period of discovery, appellant and appellee each filed cross-motions for summary judgment. On September 27, 2017, the trial court granted appellee's motion and denied appellant's motion.

**{¶ 3}** The trial court agreed with appellee that depreciation in some ways "is akin to a legal fiction, created for tax purposes and depending on how it is computed may either encourage or discourage investment by corporations in capital improvements." The trial court further agreed with appellee that depreciation was not applicable because appellee was not left in a better position than it was in prior to the accident and because "the life of a utility pole is speculative at best," despite appellee's admission of an 80-year useful life, "life expectancy of a utility pole is not easily fixed due to advancing technology." The trial court further agreed with appellee "that a utility pole is an integral part of the power distribution system. Its loss impacted the entire system; without any single pole, the entire system is disrupted and delivery of electricity to affected customers becomes impossible. As a result, it is nearly impossible to determine the value of the entire system based on the replacement of one pole." The trial court further found, "There is no proof and little legal precedent justifying the conclusion that Plaintiff here was left in a better position than before the accident."

2.

**{¶ 4}** The trial court then stated pursuant to our decision in *Toledo Edison Co. v. Teply*, 6th Dist. Erie No. E-02-022, 2003-Ohio-1417:

> [T]his court must reduce damages by the value of the pole by taking into consideration the acknowledged remaining life, or 37.5%. The court finds that Plaintiff proved damages totaling $6,697.25 [sic]. The cost of the pole must be reduced by 37.5% (or $283.33 x .375 = $106.21) resulting in a total of $6,430.23. The court finds that no other portion of the repair should be depreciated.

**{¶ 5}** Appellant then filed this appeal setting forth one assignment of error:

> I. The trial court erred when it held no genuine issue of material fact existed and granted summary judgment to appellee when conflicting affidavits from the parties' experts and competing reasonable inferences from the facts created an issue of fact.

**{¶ 6}** Appellant did not appeal the denial of his cross-motion for summary judgment.

## 1. Standard of Review

**{¶ 7}** Our review of trial court summary judgment determinations is de novo, employing the same Civ.R. 56 standard as trial courts. *Levy v. Huener*, 6th Dist. Lucas No. L-17-1081, 2018-Ohio-119, ¶ 11, citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

3.

{¶ 8} According to Civ.R. 56(C), summary judgment may be granted only:

> [I]f the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law * * * [and] that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶ 9} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Levy* at ¶ 12, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit.

Civ.R. 56(E). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must

4.

respond with specific facts showing that there is a genuine issue of material fact for trial. *Id.*

{¶ 10} A material fact is one which would affect the outcome of the suit under the applicable substantive law. *Levy* at ¶ 12, citing *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999). To determine if a genuine issue exists, we inquire whether the evidence in dispute is sufficient to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Wall v. Firelands Radiology*, 106 Ohio App.3d 313, 322-323, 666 N.E.2d 235 (6th Dist.1995).

## 2. Negligent Damage to a Utility Pole

{¶ 11} "To establish actionable negligence, [plaintiff] must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom." *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989), citing *Di Gildo v. Caponi*, 18 Ohio St.2d 125, 247 N.E.2d 732 (1969). Appellant's appeal is narrowly focused on the trial court's determination of the third element of actionable negligence with respect to appellee's damages.

{¶ 12} The purpose of a damage award is "to make the injured party whole." *Ohio Edison Co. v. Houser*, 6th Dist. Erie No. E-17-063, 2018-Ohio-4156, ¶ 17, quoting *Teply*, 6th Dist. Erie No. E-02-022, 2003-Ohio-1417, at ¶ 34. The injured party bears the burden of proving the pecuniary value of the injury, resulting in neither overcompensation nor undercompensation to the injured party. *Illum. Co. v. Wiser*, 11th Dist. Ashtabula Nos. 2017-A-0082, 2017-A-0083, 2017-A-0084, 2018-Ohio-2248, ¶ 17,

5.

citing *Ohio Edison Co. v. Royer*, 2018-Ohio-75, 92 N.E.3d 912, ¶ 11 (9th Dist.); *see*

*Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 184, 327 N.E.2d 654 (1975); *see also*

*Martin v. Design Constr. Servs.*, 121 Ohio St.3d 66, 2009-Ohio-1, 902 N.E.2d 10, ¶ 18,

quoting *Northwestern Ohio Natural Gas Co. v. First Congregational Church*, 126 Ohio

St. 140, 150, 184 N.E. 512 (1933) ("We said that the fundamental purpose of law was 'to

afford to the person damaged *compensation for the loss sustained*.' (Emphasis sic.)").

According to the Ohio Supreme Court, the "essential inquiry is whether the damages

sought are reasonable." *Martin* at ¶ 25.

{¶ 13} This court has held the negligent damage to a utility pole is calculated as

the reasonable reproduction cost (also referred to as the "repair" or the "restoration" cost)

of the utility pole and its attached facilities "less accrued depreciation of the damaged

pole and the facilities attached thereto." *Houser* at ¶ 17, quoting *Teply* at ¶ 34.

{¶ 14} Our damage award calculation takes into consideration that since a utility

pole and its attached facilities is property with no real market value, the condition of the

property prior to the damage is included in calculating the reasonable cost of restoration.

*Wiser* at ¶ 17, citing *Royer* at ¶ 11; *see Martin* at ¶ 21, citing *First Congregational*

*Church* at 150-151. Our calculation of the reasonable cost of restoration also takes into

consideration that the damaged property at issue, a utility pole and its attached facilities,

can be repaired because the damage is neither permanent nor irreparable. *See Cubbedge-*

*Parker v. Dillard*, 6th Dist. Lucas No. L-15-1245, 2016-Ohio-3367, ¶ 9, citing *Ohio*

6.

*Collieries Co. v. Cocke*, 107 Ohio St. 238, 140 N.E. 356 (1923), paragraph five of the syllabus.

{¶ **15**} The foregoing calculation is the law of this jurisdiction, and the trial court in this matter correctly stated the law in its summary judgment decision. *See Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 13 (applying the appropriate legal standard is a question of law, which we review on a de novo basis).

### 3. Indirect Costs

{¶ **16**} Appellant's first argument of a genuine issue of material fact was "whether Appellee's indirect costs are proven with reasonable certainty." The trial court's damage award of $6,430.23 in favor of appellee included appellee's indirect costs ("administrative expenses that account for human resources, information technology, accounting and legal support"), but the precise allocation between direct and indirect costs was not specified in its September 27, 2017 judgment entry.

{¶ **17**} Appellee's reasonable cost of restoration of the negligently damaged utility pole may include "'its actual costs of repairs by adding indirect costs * * * if [such] costs are proved with reasonable certainty and have been correctly assessed in accordance with sound accounting principles.'" (Citations omitted.) *Houser*, 6th Dist. Erie No. E-17-063, 2018-Ohio-4156, at ¶ 21, quoting *Bell Tele. Co. v. Vaughn Bldg. Co.*, 10th Dist. Franklin NO. 83AP-1093, 1984 Ohio App. LEXIS 11645, *13 (Nov. 20, 1984) (additional citation omitted).

7.

{¶ 18} The parties disagreed as to whether appellee's internal accounting practices and application of federal (FERC) and state (PUCO) regulations met the requisite "reasonable certainty" and causal nexus to be awarded their indirect costs in this matter. The parties introduced into the record conflicting testimony from accountants. Contrary to appellee's argument, we are not required, as a matter of law, to find appellee's internal accounting practices, whether for utility rate-making purposes or for the purpose of calculating the indirect costs of a utility pole replacement claim, automatically met its burden to prove the pecuniary value of the damage resulting from the tort of negligence. Nor are we similarly required, as a matter of law, to find appellant's accounting principles under GAAP and FERC regulations automatically met its burden to show there was a genuine issue as to a material fact to defeat appellee's summary judgment. Rather, we review the record de novo for appellee's evidence to support its summary judgment motion and for appellant's evidence opposing summary judgment.

{¶ 19} Direct costs are the wages and equipment expense "attributable to specific projects," and indirect costs "are the expenses involved in running a business, not attributable to any one project." *See Complete Gen. Constr. Co. v. Ohio DOT*, 94 Ohio St.3d 54, 57, 760 N.E.2d 364 (2002).

{¶ 20} This court has previously found the evidence supporting the use of a multiplier from all construction costs has insufficient reasonable certainty to award indirect costs for the negligent damage to a specific utility pole caused by a particular defendant. *See Houser*, 6th Dist. Erie No. E-17-063, 2018-Ohio-4156, at ¶ 23-25, citing

8.

*Toledo Edison Co. v. Czajka*, 6th Dist. Lucas No. L-02-1393, 2003-Ohio-3684, ¶ 7 and *Royer*, 2018-Ohio-75, 92 N.E.3d 912, at ¶ 31-32. This court is not alone in Ohio to reach that conclusion according to the facts presented.

{¶ 21} The Ninth District Court of Appeals found the study conducted by Ohio Edison for its indirect costs calculations "did not reasonably establish the accuracy of the cost of repairing a pole * * * simply proving that its indirect costs were calculated in compliance with FERC and PUCO regulations does not, in itself, satisfy Ohio Edison's burden of proof." *Royer* at ¶ 31-32.

{¶ 22} The Eighth District found a genuine issue of material fact existed as to the calculation of indirect costs due to the conjectural nature and guesswork from affiant Tim Wojtowicz, who could not aver with reasonable certainty if the support groups included in the indirect costs for construction as a whole are both required for the pole replacement at issue and properly allocated to such work. *See Illum. Co. v. Cochran*, 8th Dist. Cuyahoga Nos. 105887, 105888, 105889, 105890, 2018-Ohio-2514, ¶ 17, *citing Teply*, 6th Dist. Erie No. E-02-022, 2003-Ohio-1417, at ¶ 30. (Additional citation omitted.) ("[A] plaintiff, 'may not recover damages that are conjectural and matters of guesswork * * *.'").

{¶ 23} The Second District determined in a matter before it, "Fixed income employees and store expenses are remote matters from the accident which the defendant had." *Dayton Power & Light Co. v. Puterbaugh*, 2d Dist. Miami Case No. 79 CA 13,

9.

1980 Ohio App. LEXIS 13648, *8 (Mar. 7, 1980), citing *Ohio Power Co. v. Huff*, 12

Ohio Misc. 214, 222, 231 N.E.2d 897 (Canton Mun.Ct.1967).

{¶ 24} The court in *Huff* provided the following analysis and reasoning:

Damages must be proximate and cannot be remote or speculative. There is

no logical or legal connection between the breaking of a wooden power

pole by the defendant and salaries of clerks in offices, superintendents of

construction, distribution superintendents, safety co-ordinators, general

office accounting personnel, supervisors of transmission and distribution,

supervisors of labor relations, etc. The salaries of these persons whose

salaries are fixed, did not flow from, nor were they affected by the

negligence of the defendant. These salaries and expenses would have been

paid if the defendant had not broken the pole and damaged the connected

facilities. Such operating expenses might be proper in fixing a rate

schedule, but we do not feel that they have anything to do with damages to

a power pole.

*Id.*

{¶ 25} Moreover, appellee is not entitled to recover indirect costs from appellant

pursuant to the economic-loss rule, where there is no direct and proximate causal nexus

between the "costs of running business" with the damage actually caused by appellant's

negligence. *See Houser* at ¶ 29-35 (J. Mayle, concurring). The Ohio Supreme Court has

held that as a matter of law "in order to recover indirect economic damages in a

negligence action, the plaintiff must prove that the indirect economic damages arose from tangible physical injury to persons or from tangible property damage. Indirect economic damages that do not arise from tangible physical injury to persons or from tangible property may only be recovered in contract." *Queen City Terminals v. Gen. Am. Transp. Corp.*, 73 Ohio St.3d 609, 615, 653 N.E.2d 661 (1995).

{¶ 26} The importance of appellee establishing the "but for" connection between the property damage caused by appellant's negligence and its indirect costs is articulated by the First District Court of Appeals:

> [T]he law of damages is just what its name implies -- a legal concept, not an accounting concept. The two disciplines are not synonymous and their distinct purposes must not be confused. * * * While the law is concerned that all the "costs" of all torts committed against a plaintiff are recovered, the law is not concerned with whether each tortfeasor bears an equal portion of the total overhead in relation to the direct costs. To the contrary, the purpose of the law is to require the tortfeasor to pay only those costs incurred because of his actions. Accordingly, the law requires the tortfeasor to pay for those overhead costs which, with reasonable diligence by the victim, can be directly attributed with reasonable certainty to the tortfeasor.

*CG & E Co. v. Brock*, 1st Dist. Hamilton No. C-830137, 1983 Ohio App. LEXIS 11225, *9-10 (Dec. 21, 1983).

11.

{¶ 27} To support its claim of $6,607.25 as the pecuniary value of the injury sustained appellee attached to its motion for summary judgment three affidavits.

{¶ 28} The first affidavit was by Brian L. Moore, the supervisor of the repair crew on February 9, 2015. Mr. Moore averred from personal knowledge "and personal knowledge based on the records of the Plaintiff" the broken pole that was replaced "was in excellent condition * * * [with] no evidence of prior damage." Mr. Moore further averred, "We have to repair and replace the broken pole to restore service to our customers. We did not have discretion to decide a repair was not necessary or allow the temporary repair to remain indefinitely." Mr. Moore further averred, he and his crew enter data of "labor hours, materials used and vehicle usage" into a computer system called the "Crews System" and confirmed the accuracy of that data.

{¶ 29} The second affidavit was by Diana Minor, "the custodian of the records of Ohio Edison which were kept in the course of a regularly conducted business activity." Ms. Minor averred from personal knowledge "or based on information conveyed by a person having personal knowledge." Ms. Minor averred the subject utility pole was set in 1965, had an actual life expectancy of 80 years with "no added benefit to Ohio Edison to replace any pole early," and there was no record of prior damage to the pole or prior inspection "which would have required its replacement in the near future."

{¶ 30} The third affidavit was by Tim Wojtowicz, whose position with appellee was not identified. Appellee's motion referred to him as "an accountant with Ohio Edison." Mr. Wojtowicz averred from personal knowledge "and personal knowledge

12.

based on the records of the Plaintiff" the claims invoice assigned to appellant was $6,607.25 and "accurately reflect[ed] the cost to Plaintiff as a result of this incident." Mr. Wojtowicz further averred appellee's accounting system, SAP, "gathers, maintains and determines all costs incurred by Ohio Edison Company on construction projects" and accurately determined the following costs of the repair for claim No. OE005623 assigned to appellant, broken down into three categories: labor, equipment and material.

| | Labor | |
|---|---|---|
| 1 | Direct Labor Cost | $4,494.39 |
| 2 | Premium Pay | $2,515.70 |
| 3 | Regular Pay (line 1 less line 2) | $1,978.69 |
| 4 | Engineering & Supervision | $0.00 |
| 5 | Total (line 3 + line 4) | $1,978.69 |
| 6 | Engineering & Supervision - Expenses | $0.00 |
| 7 | Total (line 2 + line 5) | $4,494.39 |
| | Adjustment due to rounding | $0.00 |
| 8 | Administrative Expenses (A&G of 12.6% + Pension Costs of 17.14% + OPEB of .50%) | $915.35 |
| 9 | TOTAL LABOR COST (line 6 + line 7 + line 8) | $5,409.74 |
| | Equipment | |
| 10 | Transportation Equipment Expenses | $652.16 |
| 11 | Transportation Equipment Expenses - Light Trucks | $0.00 |
| 12 | Total Transportation Equipment Expenses | $652.16 |
| 13 | Power Operated Equipment Expenses | $0.00 |
| 14 | Total (line 12 + line 13) | $652.16 |
| 15 | Administrative Expenses (12.6% of line 14) | $82.18 |
| 16 | TOTAL EQUIPMENT | $734.34 |
| | Material | |
| 17 | Material Costs - Store Issues | $314.65 |
| 18 | Material Handling Expense (see attached calculation) | $96.69 |
| 19 | Miscellaneous Costs - Material Purchases | $0.00 |
| 20 | Miscellaneous Costs - Other | $0.00 |
| 21 | Contract Costs | $0.00 |
| 22 | Meals | $0.00 |
| 23 | Total (line 17 + line 18 + line 19 + line 21) | $411.34 |
| 24 | Administrative Expenses [12.6% of (line 17+ line 18)] | $51.83 |

13.

| 25 | TOTAL MATERIALS (line 20 + line 22 + line 23 + line 24) | $463.17 |
| | Total Claim | $6,607.25 |

The record did not contain the "attached calculation" for line 18, the "Material Handling Expense." We find that by adding lines 8, 15 and 24 from the foregoing costs shown for claim No. OE005623, the total of appellee's description of indirect costs is $1,049.36.

{¶ 31} Mr. Wojtowicz further averred:

8. The cost of labor is determined by union and other contracts based on the job classification, known as the "activity price", and is entered into SAP. The costs of benefits provided to the employee for that job classification are added to the hourly wage paid the employee to reflect the true cost per hour of the employee performing that job. In addition to wages and benefits, the true cost of labor includes Administrative Expenses, including Pension costs of 17.14%, other post-employment benefits of .50%, and accounting and general expenses of 12.6%.

* * *

11. The accounting and general expense, commonly known as overheads or indirect expenses are determined by a study measuring the cost of doing business, or maintaining employees who perform work to support the construction projects, but whose time is not directly chargeable,

or tracked through Crews for each project. The overhead rate includes human resources, information technology, accounting and legal support.

12. Accounting and general overheads are applied to the cost of any construction job. Construction jobs include responding to and repairing damaged equipment, whether or not the construction job can be recovered from a third party. Ohio Edison Company builds no profit into the cost of these jobs, but strives to accurately reflect the true cost of a construction job, whether seeking to apply the cost internally, or to recover from a third party.

{¶ 32} Appellee responded to appellant's opposition to summary judgment with a second affidavit by Mr. Wojtowicz, who averred that "[p]ole repair jobs cannot be separated from construction services" because appellee does not separately dedicate employees and support services, such as human resources, training and information technology, to pole replacements.

{¶ 33} Appellant opposed appellee's summary judgment motion with an affidavit by Keith Hock, a certified forensic accountant, who provided an opinion on the valuation of the damage to appellee's assets, which have no market value. Mr. Hock averred "to a reasonable degree of accounting probability or certainty":

16. A percentage multiplier can be used to properly allocate indirect costs to the event in question if the costs from which the multiplier is calculated is from the same type of event as the cost to which the indirect

costs are being allocated, i.e., administrative and general costs for pole replacements divided by the total cost of pole replacements.

\* \* \*

18. There is insufficient information to determine whether there is any causal connection between the accident and Plaintiff's indirect costs. Plaintiff did not specify which indirect cost support groups are required for a pole replacement or how those groups support a pole replacement. Plaintiff also did not identify what specific support groups are included in the "administrative and general" cost pool for construction projects or confirm that there is no difference between the support groups of all construction projects and those needed for pole replacements.

19. Using a multiplier that contains an unidentified range of "construction projects" with no understanding of what amount of administrative and general costs (numerator) is actually associated with the total cost for each type of construction project results in costs being allocated to a construction project without reasonable certainty that such costs are reflective of the true indirect costs for that particular project. For example, a construction project with significant direct costs could require relatively little administrative and general support but due to its high direct cost, it will have more indirect costs allocated to it based on the percentage multiplier than are truly applicable to it.

16.

20.  This concept also applies to indirect costs other than administrative and general costs.  There must be a reasonable relationship between the multiplier used and the "cost pool" from which it is created.  Plaintiff's pension cost and materials handling costs are incorporated into each replacement cost through percentage multipliers.

* * *

31.  In the matter involving Defendant Steven Soule, the damaged pole was installed in 1965 and had been in service for 50 years at the time it was damaged.  The replacement cost for that pole claimed by Plaintiff is $6,607.25.  That amount less Plaintiff's claimed indirect costs is $5,461.20.  The amount of that cost that represents accumulated depreciation is 50/80 of $5,461.20, or $3,413.25.  The value of Plaintiff's pole at the time it was damaged is $5,461.20 minus $3,413.25, or $2,047.95.

{¶ 34} Appellant also pointed to testimony on behalf of appellee about appellee's failure to track the actual indirect costs of the restoration costs for a specific utility pole and its attached facilities.  Similar to the record in *Houser*, appellant submitted into the record in this matter excerpts from a transcript of proceedings captioned *Ohio Edison Co. v. Royer*, Akron M.C. No. 15CVE05635 (July 15, 2016).  *Houser*, 6th Dist. Erie No. E-17-063, 2018-Ohio-4156, at ¶ 22.  Appellee's witness testified appellee deliberately chooses to aggregate all of its construction projects indirect costs when determining the multiplier—rather than track indirect costs—because "it's cheaper" without elaboration.

17.

**{¶ 35}** We find appellant met his burden to show there are genuine issues of material fact regarding appellee's indirect costs to defeat appellee's motion for summary judgment on negligence damages. Appellee did not meet its burden of proving the pecuniary value of the indirect costs for the injury it sustained due to appellant's negligence. Appellee's evidence in the record failed to meet the threshold of reasonable certainty, even if it correctly assessed indirect costs in accordance with sound accounting principles. In addition, appellee's evidence failed to establish a direct and proximate causal nexus between the costs of running appellee's business with the damage actually caused by appellant's negligence. We reverse the trial court's award of indirect costs to appellee.

### 4. Depreciation Factor

**{¶ 36}** Appellant's second argument of a genuine issue of material fact was "whether depreciation is applicable to Appellee's full replacement cost or just the cost of the pole." Appellant argued depreciation should apply to the full direct costs (after deducting the indirect costs) to restore the utility pole and its attached facilities because that calculation represented the actual loss sustained by appellee caused by appellant's negligence.

**{¶ 37}** Through his expert, Mr. Hock, appellant argued the trial court erred as a matter of law by not applying depreciation to appellee's full direct costs because that calculation avoided overcompensating appellee with an unanticipated, brand-new asset. Mr. Hock averred his opinion was consistent with accounting regulations because all

18.

direct costs "must be included in the allocation between damages and betterment. All costs incurred in the replacement of the damaged pole were costs Plaintiff would have incurred in replacing the pole at the end of its useful life, had the accident not occurred." Mr. Hock further averred, "The value of Plaintiff's damages can be calculated by using straight line depreciation to allocate the replacement cost between the number of years expected and not received from the damaged pole (damages) and the number of years the new pole is expected to last beyond what was expected from the damaged pole."

{¶ 38} Appellant argued appellee's full direct costs were $5,461.20, and after applying straight line accrued depreciation, the final damage calculation should have been $2,047.95. Appellant urged us to find that since appellee's evidence of the full restoration costs, claim No. OE005623, is the pecuniary value of the alleged injury it sustained, then that full cost of restoration, minus the indirect costs, should be subject to accumulated depreciation. Appellant argued in opposition to summary judgment:

> Eric Hermann, an employee at First Energy, testified on behalf of Ohio Edison on the same issues presented in this case in *Ohio Edison Co. v. Royer*, Akron M.C. No. 15CVE05635 (July 15, 2016). In his testimony, Mr. Hermann agreed that the cost of direct labor, transportation, materials and all "associated costs to get the asset up and running" were included in Plaintiff's capital asset account for poles and depreciated over the life of the pole. * * * The intention of damages law is to compensate the plaintiff for the value of what it lost, and the value of Plaintiff's poles to Plaintiff

includes all costs incurred in replacing (installing) a pole, regardless of whether it is replaced early or at the end of its useful life. To apply depreciation only to material costs would not result in an accurate determination of the value of what Plaintiff lost.

{¶ 39} Appellee responded that the full restoration costs were necessary to be made whole and were not the result of any profit. Appellee argued no depreciation should be applied to any portion of the restoration costs because the utility pole was part of a larger distribution system that required the full cost of restoration to be made whole. Appellee argued that replacing the utility pole and "maintaining the pole's connection to the larger system" was, in fact, a repair to "[t]he entire electric distribution system." Appellee further argued applying depreciation was against "the majority view in the United States," citing cases from 16 other state courts of various jurisdictions, and urged us to find our decisions in *Teply* and *Czajka* were wrongly decided. Appellee further argued, "The system as a whole must function to deliver electric[ity] to customers. Damage to any one part of the system renders the system itself useless until the repair is made. Like a building without a door, the system cannot function for its stated purpose unless the repair is performed."

{¶ 40} Appellee then argued in the alternative: if depreciation were to be applied, it should only be to the utility pole material itself and not to the entire invoice, because the "pole is simply one very, very small part of Ohio Edison's electric distribution system. It is improper to focus on the accounting of a single utility pole within Ohio

20.

Edison's accounting system rather than looking to the value of the electric distribution system as a whole." Appellee offered the following math for calculating its damages, which the trial court essentially adopted: "Pole set in 1965-62.5% of its useful life – 37.5% remaining life. Pole cost: $283.23 x .375 = $106.21 (reduction of $177.02). Invoice: $6,607.25 – 177.02 = $6,430.23." The record, however, does not contain any evidence of a "pole cost" of $283.23 for claim No. OE005623.

{¶ 41} We find both parties questioned the law for the appropriate legal standard of determining the amount of tort damage, represented in dollars, to be ordered to be paid to appellee for a utility pole that was the casualty of appellant's negligence. "T]he determination of whether depreciation applies to the utility's full replacement costs or just the cost of the pole is a question of law that we review de novo, not a question of fact to be resolved from a determination of the credibility of competing experts. *See Wiser*, 11th Dist. Ashtabula Nos. 2017-A-0082, 2017-A-0083, 2017-A-0084, 2018-Ohio-2248, at ¶ 27, citing *Royer*, 2018-Ohio-75, 92 N.E.3d 912, at ¶ 7. Our de novo review "is without deference to the trial court's determination." *Warren v. Libbey Glass, Inc.*, 6th Dist. Lucas No. L-09-1040, 2009-Ohio-6686, ¶ 31, citing *Brown v. Cty. Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993).

{¶ 42} This court has consistently held that as a matter of law straight line depreciation must be applied when calculating the reasonable replacement cost for negligent damage to a utility pole and its attached facilities. *Houser*, 6th Dist. Erie No. E-17-063, 2018-Ohio-4156, at ¶ 19, citing *Teply*, 6th Dist. Erie No. E-02-022,

21.

2003-Ohio-1417, at ¶ 34 and *Royer* at ¶ 19-21; *Wiser* at ¶ 21, citing *Ohio Edison Co. v. Cutright*, 11th Dist. Portage Case No. 90-P-2238, 1991 Ohio App. LEXIS 4296, *4-5 (Sept. 13, 1991) and *Ohio Power Co. v. Zemelka*, 19 Ohio App.2d 213, 216, 251 N.E.2d 2 (7th Dist.1969). Despite appellee's insistence that 16 of the 50 states in this country, plus some other jurisdictions in Ohio, constitute a "majority view" allegedly contrary to this court's past decisions, we are unpersuaded. *See Houser* at ¶ 18; *see also Royer* at ¶ 14. "Clearly, depreciation is an elastic concept which is designed to function differently under different circumstances." *Akron v. Pub. Util. Com.*, 51 Ohio St.2d 27, 29, 364 N.E.2d 869 (1977).

{¶ 43} There is merit to appellant's argument that we should apply accumulated depreciation to the full direct costs of the utility pole restoration where the record contains appellee's evidentiary proffer of claim No. OE005623 as the pecuniary value of the injury it sustained due to appellant's negligence. The record shows appellee consistently referred to claim No. OE005623 as the "true cost" to be made whole and insisted the damaged utility pole was an indivisible part of the entire electric system. For summary judgment purposes by accepting appellee's evidence as true, in this case we cannot limit the depreciation of the pecuniary value of the damaged utility pole and its attached facilities to just a physical pole. Although appellee provided line-by-line detail for claim No. OE005623 under categories for labor, equipment and materials, we do not find any distinction for the "pole" itself. The result is that we are faced with only an entire "true cost" evidentiary proffer. To attempt to dissect appellee's evidence as to

22.

which evidence is for the damaged "utility pole" and which is for the "facilities attached thereto" would be prohibited conjecture and guesswork. *See Houser* at ¶ 21, citing *Ohio Edison Co. v. Fitzthum*, 6th Dist. Ottawa No. OT-02-002, 2002-Ohio-7303, ¶ 8.

{¶ 44} This court's prior decisions cited *Zemelka* with approval. *Houser* at ¶ 17; *Teply* at ¶ 34. In *Zemelka*, the Seventh District Court of Appeals found, the "measure of damages for negligent destruction of a utility pole is the cost of the pole and the facilities attached thereto based on reproduction cost less accrued depreciation of the damaged utility pole and the facilities attached thereto." *Zemelka* at 216. The court then affirmed the trial court's award of damages after applying accumulated depreciation to the undisputed "total bill" for the "necessary repairs to replace the damaged utility pole." *Id.* at 213-216. *Zemelka* did not limit the "cost of the pole and the facilities attached thereto" to just the material, as this court did under the facts presented in *Houser* and *Teply*. The Second District also interpreted *Zemelka* as applying to all direct costs under the facts presented to them. *Dayton Power & Light Co. v. Puterbaugh*, 2d Dist. Miami Case No. 79 CA 13, 1980 Ohio App. LEXIS 13648, *3 (Mar. 7, 1980). However, recently the Eleventh District Court of Appeals surveyed how *Zemelka* was interpreted by the Eleventh District in *Cutright* at *4-5, the Sixth District in *Teply* at ¶ 34, and the Ninth District in *Royer*, 2018-Ohio-75, 92 N.E.3d 912, at ¶ 18-21, concluding that each has rejected depreciating all direct repair costs in favor of only depreciating the cost of the damaged pole and the facilities attached thereto. *Wise* at ¶ 21-24. We do not find the

23.

Eleventh District reached its interpretation as a matter of law, but, rather, as a reflection of the facts presented in each case it chose to review.

{¶ 45} Our de novo review of the record shows that although the trial court correctly determined as a matter of law accumulated depreciation applied in this matter, the trial court then erroneously calculated how to apply the depreciation.

{¶ 46} The record contains undisputed evidence the utility pole damaged by appellant in 2015 was set in 1965 and had a life expectancy of 80 years. Therefore 50 of the subject utility pole's 80 years of useful life, i.e., 50/80 or 62.5 percent, had passed by the time of the accident and represents the accumulated depreciation of the utility pole and its attached facilities. The record also contains appellee's evidence, self-described as credible and competent, demonstrating the "true cost" of restoring the "utility pole and its attached facilities" damaged by appellant was $6,607.25, as shown for claim No. OE005623. The trial court found appellant's claim No. OE005623 was reasonable, and we will not disturb that finding. Appellant did not dispute the foregoing "true cost" amount, except for the indirect costs, to which we agreed did not apply in this matter. After deducting the indirect costs, appellee's "true" pecuniary value of "the utility pole and its attached facilities" damaged by appellant was $6,607.25 minus $1,049.36, or $5,557.89. The amount of accumulated depreciation of that pecuniary value was 62.5 percent of $5,557.89, or $3,473.68. We reverse, in part, the trial court's award of direct costs to appellee.

24.

### 3. Conclusion

{¶ 47} Appellant's assignment of error is well-taken in part. The trial court's grant of summary judgment in favor of appellee is affirmed, but the award of damages is reduced.

{¶ 48} We find appellee's full restoration cost of the negligently damaged utility pole and attached facilities at issue was $6,607.25, as shown by claim No. OE005623 in the record.

{¶ 49} We find appellee is not entitled to its claimed indirect costs. Therefore, the full restoration cost by appellee will be reduced by the indirect costs totaling $1,049.36. We find appellee's full direct costs were $5,557.89 ($6,607.25 minus $1,049.36).

{¶ 50} We find that as a matter of law straight line depreciation must be applied to the full direct costs of appellee's claim No. OE005623. Therefore, the full restoration cost by appellee will be further reduced by $3,473.68.

{¶ 51} Consequently, after applying the foregoing deductions, we find the trial court erred in awarding $6,430.23 in negligence damages to appellee. The trial court's damage award should have been $2,084.21 (or $6,607.25 full restoration costs minus $1,049.36 indirect costs minus $3,473.68 accumulated depreciation of the full direct costs of the negligently damaged utility pole and its attached facilities).

25.

**{¶ 52}** On consideration whereof, the judgment of the Sandusky County Court, District No. 1, is affirmed, in part, and reversed, in part.  Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.     _____      _____

                                                               JUDGE

Thomas J. Osowik, J.     _____

                                           _____

James D. Jensen, J.     _____                         JUDGE
CONCUR.

                                                 _____

                                                                 JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.