[Cite as *Illum. Co. v. Bosemann*, 2020-Ohio-3663.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| ILLUMINATING COMPANY, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108631 |
| v. | : | |
| FREDERICK A. BOSEMANN, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 9, 2020

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-16-871849

***Appearances:***

Weltman, Weinberg & Reis Co., L.P.A., and Amanda
Rasbach Yurechko, *for appellee.*

Gallagher, Gams, Tallan, Barnes & Littrell L.L.P., Mitchell
M. Talan, and Lori E. Thomson, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Frederick A. Bosemann, appeals from the trial court's judgment in favor of plaintiff-appellee, Cleveland Electric Illuminating Company ("CEI"), after a bench trial. He raises two assignments of error for our review:

1. The Trial Court erred when it held the average life expectancy of Appellee's poles did not apply to Appellee's damaged utility pole and held the replacement cost should not be depreciated as a matter of law.

2. The Trial Court erred when it held Appellee proved its indirect costs with reasonable certainty and in accordance with sound accounting principles.

{¶ 2} Finding no merit to his assignments of error, we affirm the trial court's judgment.

## I.   Procedural History and Factual Background

{¶ 3} In November 2016, CEI initiated this case against Bosemann, alleging that in 2015 Bosemann negligently damaged CEI's wooden utility pole in a motor vehicle accident in South Euclid.  CEI sought to recover $2,042.92 from Bosemann. State Farm Insurance Company provided counsel to represent Bosemann and other defendants (William Cochran, William Flynn, and Eugene Williams) facing similar claims by CEI.  The trial court consolidated Bosemann's case with CEI's cases against Cochran, Flynn, and Williams.  None of the defendants disputed liability, and the sole issue was the amount of damages.

{¶ 4} CEI moved for summary judgment against the defendants, including in its calculation of damages both direct and indirect, overhead costs.  The defendants opposed CEI's motion and filed a cross-motion for summary judgment, arguing that CEI's calculation of damages was flawed because it ignored depreciation of the poles' values and included indirect costs.  The defendants supported their motion for summary judgment with an affidavit from CPA Keith Hock, who opined that depreciation should factor into the replacement cost and that

CEI's indirect costs were not calculated with reasonable certainty. The trial court granted CEI's motion for summary judgment and denied the defendants' cross-motion, finding that the defendants presented no evidence to create a genuine dispute of material fact as to the replacement costs of the utility poles, that the replacement costs should be depreciated, and that CEI calculated its indirect costs to a reasonable degree of certainty.

{¶ 5} In June 2017, the defendants appealed the trial court's judgment, arguing that the trial court ignored Hock's affidavit, erred in holding that the replacement costs should not be depreciated, and erred in finding that the indirect costs were calculated to a reasonable degree of certainty. In *Illum. Co. v. Cochran*, 8th Dist. Cuyahoga Nos. 105887, 105888, 105889, and 105890, 2018-Ohio-2514, this court reversed the trial court's order, finding that although it was unclear whether the trial court considered Hock's affidavit, there was a genuine issue of material fact regarding indirect costs. We found that a lack of information regarding the calculation of indirect costs and a disparity in replacement costs among utility poles created a genuine issue of material fact regarding the indirect costs. We also held that "an issue of fact exists as to whether the defendants are entitled to deduct depreciation, if any, from the respective amount of damages owed to CEI."

{¶ 6} On remand, the trial court unconsolidated the cases, and Bosemann's case proceeded to a bench trial in February 2019. Before trial, the parties stipulated to the following: Bosemann was liable for damages proximately caused by his negligence; a utility pole has an average service life of 80 years; the pole at issue in

this case was set in 1993 and had been in service for 22 years when Bosemann damaged it; CEI's direct cost to repair the pole (what CEI paid for its crew, materials, and vehicle time to repair the pole) was $1,595.72; and CEI had added indirect costs in the amount of $447.20 to reach the total alleged repair cost of $2,042.92. The issues for trial were (1) the calculation of CEI's indirect costs and whether Bosemann is responsible for them, and (2) whether the depreciation in value of the utility pole should reduce Bosemann's damages for direct and indirect costs.

{¶ 7} CEI called two witnesses: John Klaben and Eric Weaver. Klaben, an engineer for FirstEnergy Service Corporations ("FirstEnergy"), the umbrella organization that provides services to CEI, testified regarding FirstEnergy's inspection program to assess the structural integrity of utility poles. He testified that utility poles generally do not show signs of age and must be tested by digging at the pole's base to check for rot or by drilling into the pole to look for voids. He explained that a third-party inspector tests the poles and determines their strength. Klaben testified that if a pole's design strength is reduced to less than two-thirds of its original strength, then the pole must be replaced or remediated by applying a fiberglass wrap or steel truss. Klaben stated that he did not know how long the remediation typically lasts and that poles are routinely inspected to assess their strength. He testified that there is no certain age at which a pole is replaced, and nothing special is done when a pole has been in service for 80 years if the pole continues to pass inspections.

**{¶ 8}** CEI introduced as evidence the inspection records created by third-party inspector, Osmose, for the pole that Bosemann damaged. Klaben testified that the reports show that the pole was inspected in 2007 and 2014 and that it had no outward signs of decay or other deficiencies. He explained that the 2007 report reflected a sound inspection and that Osmose did not dig to assess the base of the pole at that time. Klaben testified that the 2014 report was based on a circuit inspection that assessed the attachment of the lines to the pole rather than the pole itself. He stated that based on the pole's condition, CEI would not have scheduled to replace it within the next few years. He explained that when the pole was damaged in 2015, CEI needed to replace it or else the conductor would lay on the ground and cause a safety hazard.

**{¶ 9}** Eric Weaver, an analyst for FirstEnergy, testified that he works with FirstEnergy's operating companies like CEI to help them understand their monthly finances. He explained that he reviews invoices from the FirstEnergy claims department and works with the FirstEnergy accounting department to evaluate the calculation of overhead costs, also called indirect costs. Weaver testified that the calculations of these indirect costs are important to comply with guidelines from the Federal Energy Regulatory Commission ("FERC"), which governs interstate energy transmission, and the Public Utilities Commission of Ohio ("PUCO"), which governs intrastate activity. Weaver explained that the indirect costs provide the true cost for each activity that FirstEnergy completes and provides a way, "since we are regulated by FERC and the Utility Commission, to put those fully loaded costs onto a project."

{¶ 10} Weaver testified that indirect costs include "administrative and general costs," which include the following: Information technology support for the dispatch system and the mobile data terminal in each vehicle (through which crews enter their time and vehicle and material usage for each job); human resources support for training employees; accounting support to make sure "all the costs are flowing correctly based on the jobs that they are charging"; executive leadership support; and internal legal costs. Weaver explained that internal legal costs include general corporate expenses and not litigation, but he stated that his time in trial for this matter would be factored into the overall allocation of indirect costs. Weaver testified that indirect costs also include pension costs and other post-employment benefits. He explained that pension costs are calculated based on an annual study by FirstEnergy's actuaries in accordance with FERC and PUCO guidelines. He stated that other post-employment benefits include medical coverage and life insurance for employees and are calculated and apportioned according to FERC and PUCO guidelines.

{¶ 11} Weaver testified that FirstEnergy calculates administrative costs by reviewing the costs across all ten of its operating groups, apportioning a percentage of those costs specifically to CEI, and allocating those costs over all of the budgeted work that the construction crews perform. He explained that the apportionment is based on the accounting department's annual study of historical actuals, customer accounts, and the current budget. Weaver testified that based on the study, FirstEnergy will determine a multiplier to use to allocate costs among its operating

companies and construction projects. He stated that the multiplier consists of a numerator and a denominator: the numerator is the total amount of projected indirect costs to be allocated, and the denominator is the total amount of the projected direct costs for a particular operating company for the upcoming year. He further testified that FirstEnergy's internal and external audit groups review the annual study and work with FERC and PUCO to make sure FirstEnergy complies with their guidelines.

{¶ 12} For the claim at issue in Bosemann's case, CEI introduced the following three exhibits: (1) the CREWS work summary; (2) the claim department's invoice; and (3) the analysts' costs summary. Weaver testified that FirstEnergy uses the CREWS system to estimate the quantity of material that line crews will need for a particular job. He explained that the CREWS summary shows the equipment, material, labor, and vehicle charges entered into the mobile data terminal in the vehicle on the repair site. He explained that the claims department invoice summarizes the material, labor, equipment, labor, and miscellaneous costs, both direct and indirect charges. Weaver testified that the analyst summary includes all direct charges from the mobile data terminal as well as administrative charges for labor, transportation, and material.

{¶ 13} Weaver testified that the direct labor costs charged to the subject utility pole were $991.70, and the indirect charges for labor were $296.91. Based on the annual study to determine the multipliers that Weaver had described, the indirect charges were calculated by multiplying the direct labor costs by 12.3% for

"administrative and general" costs, by 17.4% for pension costs, and by .50% for other post-retirement benefits, which values were then added together. Weaver testified that for transportation and equipment, the direct costs were $294.30, and the indirect charges were $36.20. He explained that the indirect charges were calculated by multiplying the direct costs by 12.3% for "administrative and general" costs. Weaver testified that for materials, the direct costs (the materials plus warehouse storage) were $377.39 and the indirect costs (the "administrative and general" costs) were $46.42, which was calculated by multiplying the direct costs by 12.3%.[1] He testified that the total amount of the claim, including both direct and indirect costs, was $2,042.92.

{¶ 14} Weaver testified that there is no market for used utility poles and that CEI could not purchase a utility pole with only 58 years of life expectancy remaining. He explained that the utility poles are 100% useful to CEI until they are damaged, and regardless of the age of the pole, CEI charges the tortfeasor to recover the full cost of the pole. Therefore, he explained, CEI does not subtract depreciation of value based on the age of the pole on its claims. Weaver testified that for accounting purposes, CEI uses a 40-year depreciable life and depreciates the pole's value on its

---

[1] Based on Weaver's testimony and CEI's exhibits, the total direct costs are $1,663.39 ($67.67 higher than the $1,595.72 to which the parties stipulated) and the total indirect costs are $379.53 ($67.67 lower than the $447.20 to which the parties stipulated). The CREWS work summary lists a materials line item of $67.67 for "Material Handling Expense." Weaver testified that this expense represents the cost that CEI incurs to store the utility pole "so that it can be sourced out at a moment's notice."

accounting books. Weaver testified that any costs CEI does not recover from the tortfeasor are passed to the customers who pay for the utility.

{¶ 15} Bosemann called one witness, Keith Hock, who was designated as an expert in forensic accounting. Hock opined that the value of the subject utility pole should be $1,156.90 — the direct costs as provided by CEI minus depreciation. Hock testified that he did not include indirect costs in his valuation because he did not find any evidence in the documents that he reviewed that established how administrative personnel "contributed in any way to the specific replacement of the pole on that particular day." Hock explained that CEI's multiplier method for allocating costs "is a perfectly fine way for them to manage their business. I just don't think it's the right way to calculate damages." He testified that damages must be calculated with reasonable certainty and have been caused by the event in question. He opined that accounting regulations like FERC's do not inform how to calculate damages.

{¶ 16} Hock testified that to calculate the direct costs, he started with the replacement cost, $1,595.72, because it represents the value of the new pole. He then used the parties' stipulation that the average life expectancy of the pole was 80 years, subtracted the 22 years that the pole had already been in service, and determined that the pole had 58 years of remaining life at the time when it was damaged. Hock testified that Bosemann needed to compensate CEI for the value of those 58 remaining years. He explained that he then multiplied 58/80, representing the remaining 58 years, with the $1,595.72 replacement cost to determine the

damages to be $1,156.90. He testified that in other words, the pole had depreciated by 22/80 of its life, and that value (22/80 multiplied by the $1,595.72 replacement cost) was subtracted from the replacement cost. On cross-examination, Hock conceded that his opinions are not based on Ohio damages law, and he had not reviewed case law regarding indirect costs or depreciation of utility poles.

{¶ 17} After the trial, both parties submitted proposed findings of fact and conclusions of law as well as trial summations. The trial court entered judgment in favor of CEI and against Bosemann for the full claimed amount of $2,042.92. As to indirect costs, the trial court concluded,

> [CEI] has proven that the indirect charges billed to Boseman [sic] were determined in accordance with the accounting principles of FERC and PUCO. The indirect expenses were shown with reasonable certainty to be directly related to efforts of the support groups to allow the construction group to perform its job. Based on the evidence and legal standard before it, the court can find no appropriate way to apportion the indirect costs other than by the method advanced by [CEI].

As to depreciation, the trial court found,

> [CEI] has proven that there is no reason to believe that this pole would have been replaced after 80 years, and remediation methods may exist at that time to extend the useful life of the pole. Further, the court is loathe to pass these expenses to consumers when such expenses were incurred through the acts of a tortfeasor. Based on the evidence and legal standard before it, the court finds that it is impractical to attempt to apply a rule regarding the applicability of depreciation to the cost of repair for this utility pole. The costs to determine the useful life of the poles would likely outweigh the replacement cost and would be borne by consumers. Indeed, it would involve considerable speculation to state when the utility pole damaged by Bosemann would have been replaced but for his tortious action. Courts in many other states have reached the same conclusion as the court in *Ohio Power*. [] This approach is the least complicated in application and the most likely to

make [CEI] whole. Such approach also is efficient and provides the most certainty to the parties involved.

{¶ 18} It is from this judgment that Bosemann now appeals.

## II. Law and Argument

{¶ 19} The parties agree that the appropriate measure of damages is the cost to repair the utility pole, but they disagree on what cost would make CEI whole without overcompensating it. Bosemann contends that the trial court erred in not subtracting depreciation from the replacement cost of the pole and in allowing CEI to recover indirect costs.

{¶ 20} "The purpose of a damage award is to make the injured party whole." *Illum. Co. v. Burns*, 8th Dist. Cuyahoga No. 100235, 2014-Ohio-502, ¶ 6, citing *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654 (1975). "An injured party 'should be neither undercompensated nor overcompensated,' and bears the burden of proving the pecuniary value of the injury." *Ohio Edison Co. v. Royer*, 2018-Ohio-75, 92 N.E.3d 912, ¶ 11 (9th Dist.2018), quoting *Howard*. "When property has no real market value, 'damages [can] be awarded based on the reasonable cost of restoration, with consideration of the condition of the property prior to the damage.'" *Royer* at ¶ 11, quoting *Martin v. Design Constr. Servs.*, 121 Ohio St.3d 66, 2009-Ohio-1, 902 N.E.2d 10.

### A. Depreciation

{¶ 21} Bosemann divides his first assignment of error into two parts. First, Bosemann argues that the trial court's ruling that depreciation should not be applied because no evidence was presented as to the life expectancy of the pole was against

the manifest weight of the evidence.  Second, Bosemann contends that trial court should have subtracted depreciation as a matter of law.

### 1.  The Trial Court's Ruling

**{¶ 22}** Bosemann first argues that the trial court's determination that "there was no evidence the average life expectancy was applicable to the damaged pole, and as a result, that depreciation should not be considered in calculating damages" is against the manifest weight of the evidence.  He contends that the trial court's finding was inconsistent with the parties' stipulation, the evidence presented at trial, and this court's prior decision in this case.

**{¶ 23}** We first note that Bosemann's characterization of the trial court's determination is inaccurate.  The trial court found that CEI "has proven that there is no reason to believe that this pole would have been replaced after 80 years" – not that "there was no evidence" of life expectancy.

**{¶ 24}** As the Ohio Supreme Court explained in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997):

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier of fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."

**{¶ 25}** When deciding whether a judgment is against the manifest weight of the evidence,

we examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered.

*Gerston v. Parma VTA, L.L.C.*, 8th Dist. Cuyahoga No. 105579, 2018-Ohio-2185, ¶ 58. "In weighing the evidence, we are guided by a presumption that the findings of the trier of fact are correct." *Id.* at ¶ 59.

{¶ 26} Bosemann first argues that the trial court's finding contradicts the parties' stipulation that "a utility pole has an average useful life in the field of 80 years." However, the parties did not stipulate to the life expectancy of the specific pole at issue. There was no expert testimony or other evidence presented to show that the utility pole at issue had an average useful life of 80 years.

{¶ 27} Bosemann next argues that the trial court's finding that CEI has proven that there is no reason to believe that this pole would have been replaced after 80 years is inconsistent with evidence presented at trial. Bosemann contends that, although the trial court relied on Klaben's testimony that "there was no reason to assume that the Bosemann pole would need to be replaced at 80 years," Klaben did not actually testify to that. Bosemann further points out that Klaben testified that the inspection reports indicated only that there were no outward signs of rot, not that there was no internal or sub-surface rot. Bosemann argues that Klaben agreed that CEI does not expect its poles to last indefinitely and that the pole at issue was consistent with the condition he would expect for a pole of that age. Bosemann further contends that Weaver acknowledged that he had no information that the

pole would have outlasted the average life expectancy. Lastly, Bosemann argues that the existence of remediation methods is irrelevant considering the parties' stipulation that the average life for a utility pole in the field is 80 years.

{¶ 28} However, the trial court weighed the witness's credibility, acknowledged the parties' stipulation, and heard testimony regarding the subject utility pole. On a manifest-weight standard, we must presume that the fact finder's determinations are correct unless we find that the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered." *Gerston*, 2018-Ohio-2185, at ¶ 58-59. Here, CEI presented inspection reports reflecting that the pole showed no signs of deterioration and that remediation measures existed to show that the pole would not automatically need to be replaced at 80 years. Klaben testified that there is no certain age at which a pole is replaced, and nothing special is done when a pole has been in service for 80 years if the pole continues to pass inspections. Even though the trial court misstated part of Klaben's testimony, we cannot find that the trial court clearly lost its way in finding that CEI "has proven that there is no reason to believe that this pole would have been replaced after 80 years."

{¶ 29} Bosemann further argues that the trial court's finding that CEI has proven that there is no reason to believe that this pole would have been replaced after 80 years contradicted this court's opinion reversing the trial court's grant of summary judgment. He points to paragraph 19 of our prior decision, where we stated,

> [T]here was no evidence by CEI that the pole inspections demonstrated the utility poles would outlast their expected life. Therefore, an issue of fact exists as to whether the defendants are entitled to deduct depreciation, if any, from the respective amount of damages owed to CEI.

*Cochran*, 8th Dist. Cuyahoga Nos. 105887, 105888, 105889, and 105890, 2018-Ohio-2514, at ¶ 19. Bosemann therefore contends that CEI needed to present affirmative evidence that the utility pole would have exceeded the anticipated 80-year life expectancy. He maintains that this standard is consistent with wrongful death cases where an average life expectancy is used unless either party presents evidence of why the average is not applicable to the decedent.

{¶ 30} Under the law-of-the-case doctrine, "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3–4, 462 N.E.2d 410 (1984). The law-of-the-case doctrine applies only to legal issues "that have been decided with finality." *Williams v. Matthews*, 8th Dist. Cuyahoga No. 103501, 2016-Ohio-3461, ¶ 7. In paragraph 19 of our prior decision in this case, we remanded for the determination of a factual question. We did not decide a legal issue or determine the standard or burden of proof that CEI must meet on remand. Moreover, as previously discussed, CEI did present affirmative evidence at trial that the utility pole may not need to be replaced after 80 years. Thus, the trial court did not err in determining facts inconsistent with our prior decision.

## 2. Application of Depreciation

{¶ 31} Bosemann also argues that the trial court should have subtracted depreciation from the replacement cost of the utility pole to determine damages.

{¶ 32} CEI contends that we should employ a manifest-weight standard to evaluate whether the trial court erred when it declined to subtract depreciation, pointing to *Gerston*, 2018-Ohio-2185, at ¶ 57-59. In *Gerston*, we stated that we apply a manifest-weight standard when reviewing factual determinations from a bench trial. *Id.* But even for appeals arising from a bench trial, we review de novo the application of law to facts. *Cook Rd. Invest., LLC v. Bd. Of Cuyahoga Cty. Commrs.*, 194 Ohio App.3d 562, 565, 2011-Ohio-2151, 957 N.E.2d 330 (8th Dist.). Moreover, "the determination of whether depreciation applies to the utility's full replacement costs or just the cost of the pole is a question of law that we review de novo, not a question of fact to be resolved from a determination of the credibility of competing experts." *Illum. Co. v. Wiser*, 2018-Ohio-2248, 114 N.E.3d 240, ¶ 27 (11th Dist.). "Therefore, we consider the question of law without deference to the trial court's decision, while affording due deference to the findings of fact in the trial court's judgment." *Royer*, 2018-Ohio-75, 92 N.E.3d 912, at ¶ 7.

{¶ 33} Bosemann contends that Ohio appellate courts that have considered the issue "have all found that when determining damages, the replacement cost must be reduced to account for the depreciated condition of the damaged pole." Bosemann cites to *Ohio Power Co. v. Zemelka*, 19 Ohio App.2d 213, 251 N.E.2d 2 (7th Dist.1969); *Ohio Edison v. Houser*, 6th Dist. Erie No. E-17-063, 2018-Ohio-

4156; *Ohio Edison Co. v. Soule*, 6th Dist. Sandusky No. S-17-052, 2018-Ohio-4624; *Royer*, 2018-Ohio-75, 92 N.E.3d 912; and *Wiser*, 2018-Ohio-2248, 114 N.E.3d 240 (11th Dist.). The appellate courts in these cases subtracted depreciation to determine damages for utility pole replacement, but we do not find their holdings create a bright-line rule that we must follow.

{¶ 34} Based upon our review of the case law, there is no bright-line rule as to whether to subtract depreciation from the replacement cost to determine damages for a utility pole. *See Royer* at ¶ 17 ("Upon due consideration, this Court deems it impractical to attempt to apply a one-size-fits-all rule regarding the applicability of depreciation to the cost of repair for the negligent destruction of a utility pole[.]"). "Applying the proper measure of damages in a case of this nature turns on the unique facts and circumstances of the case, and may depend upon the evidence and expert testimony presented in a case." *Id.* at ¶ 16. In *Zemelka*, the Seventh District recognized that,

> A careful reading of the cases indicates that the differences between the various cases are of fact rather than principle in many instances. One of the problems that concerns courts in deciding this issue is whether the life expectancy of an individual pole can be ascertained with reasonable certainty; and the facts in the various cases vary in establishing the life expectancy of the utility pole.

*Zemelka* at 215.

{¶ 35} In *Royer* and *Zemelka*, the appellate courts found that the life expectancy of the utility pole at issue had been established with reasonable certainty, and they therefore applied depreciation to calculate damages. *Royer* at ¶ 17;

*Zemelka* at 215. As to the other cases on which Bosemann relies, in *Wiser*, the Eleventh District faced the issue of what costs specifically to apply depreciation and found that CEI had waived its right to argue that the trial court erred in applying depreciation at all. *Wiser* at ¶ 25. Thus, *Wiser* is not helpful to our analysis. *Houser* and *Soule* rely on *Toledo Edison v. Teply*, 6th Dist. Erie No. E-02-022, 2003-Ohio-1417, for a bright-line rule to apply depreciation. But *Teply* relies on *Zemelka* and *Ohio Edison Co. v. Cutright*, 11th Dist. Portage No. 90-P-2238, 1991 Ohio App. LEXIS 4296 (Sept. 13, 1991), which also relies on *Zemelka* and does not apply depreciation.

{¶ 36} The lack of a bright-line rule is consistent with the case to which CEI directs us: *Ohio Power Co. v. Johnston*, 18 Ohio Misc. 55, 247 N.E.2d 338 (C.P.1968). In *Johnston*, the trial court could not determine the value of the damaged pole without putting it into the context of the entire electrical system. *Id.* at 59. The trial court declined to subtract depreciation, holding, "[w]here the measure of damages is determined by cost of repair, depreciation as to the damaged property is applicable only to the extent that the repairs increase the value of plaintiff's property, and where the cost of repairs do no more than make the plaintiff whole, depreciation need not be applied." *Id.* at 55. CEI also points to jurisdictions outside of Ohio that have reached conclusions similar to *Johnston*. As the Ninth District explained in *Royer*, at ¶ 14,

> Ohio Edison also cites to courts outside of this state to demonstrate that other jurisdictions have reached conclusions similar to *Johnston*. Such cases include an array of considerations inherent in determining the

appropriate damage award for negligent destruction of a utility pole. However, each involves a review of specific facts particular to each case, none of which are relevant to our review. *See, e.g. Zemelka*, 19 Ohio App.2d at 215, (acknowledging "[o]ther courts hold that there is not a discernible life expectancy of an individual pole; that a court can not [sic] say with reasonable assurance that the installation of a new pole did more than remedy the wrong done, and, therefore, that it is impractical to attempt to apply a measure of damages based on the difference in value before and after the accident."), citing *Johnston, supra*; *New Jersey Power & Light Co. v. Mabee*, 41 N.J. 439, 197 A.2d []; *Carolina Power & Light Co. v. Paul*, 261 N.C. 710, 136 S.E.2d 103 (1964); *Southwestern Electric Power Co. v. Canal Ins. Co.*, 121 So.2d 769 (La.App. 1960).

{¶ 37} Here, the trial court determined that CEI proved that the average 80-year life expectancy did not apply to the utility pole at issue, and we have determined that this finding is not against the manifest weight of the evidence. Applying this fact to the law from *Johnston*, *Zemelka*, and *Royer*, we determine that the life expectancy of the pole that Bosemann negligently damaged was not established, and the trial court therefore did not err in declining to subtract depreciation from the damages that Bosemann owes to CEI. We therefore need not address Bosemann's arguments regarding whether depreciation should apply to labor and indirect costs.

{¶ 38} Accordingly, we overrule Bosemann's first assignment of error.

## B. Indirect Costs

{¶ 39} In his second assignment of error, Bosemann argues that the trial court erred in holding that CEI proved its indirect costs with reasonable certainty and in accordance with sound accounting principles. He maintains that even though CEI presented evidence that it calculated indirect costs in compliance with FERC and PUCO regulations, such compliance does not satisfy the "reasonable certainty"

requirement. He contends that CEI's evidence of its internal accounting practices and compliance with regulations does not demonstrate a causal nexus between the indirect costs and the repair project at issue in this case.

{¶ 40} Bosemann frames the issue as a question of law requiring a de novo review: "whether the trial court properly applied the facts to the applicable legal standard[.]" CEI contends that we should determine whether the trial court's ruling was against the manifest weight of the evidence. We will follow *Royer* in applying a de novo review where the Ninth District likewise faced the issue of whether a utility established indirect costs to a reasonable degree of certainty:

> We consider whether the trial court correctly applied the law to the facts of the case as a question of law, which we review de novo. *See Copley Twp.* [*v. Fairlawn*, 9th Dist. Summit Nos. 27010, 27012, and 27040], 2015-Ohio-1121 at ¶ 16. We refrain from disturbing the factual findings of the trial court's judgment unless those findings are against the manifest weight of the evidence. *Id.* An appellate court will not substitute its judgment for that of the trial court, or disturb the judgment so long as the factual findings are supported by competent, credible evidence. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). An appellate court is "guided by a presumption that the findings of the trier-of-fact were indeed correct." *Id.*

*Royer*, 2018-Ohio-75, 92 N.E.3d 912, at ¶ 24.

{¶ 41} Under Ohio law, "[d]amages include both direct and indirect costs. Direct costs are the expenses incurred as a result of the actual project and include materials, labor, mileage, and equipment costs." *Burns*, 2014-Ohio-502, at ¶ 6. "Indirect costs are the expenses involved in running a business and are not attributable to any one project." *Id.* "Indirect costs may include salaries of executive

or administrative personnel, general insurance, rent, utilities, telephone, * * * professional fees, legal and accounting expenses, advertising, and interest on loans." *Id.* "Indirect costs of repairs 'are a proper element of damage for which recovery may be had, where such costs can be proved with reasonable certainty and have been correctly made in accordance with sound accounting principles.'" *Id.*, quoting *Warren Tel. Co. v. Hakala*, 105 Ohio App. 459, 460, 152 N.E.2d 718 (11th Dist.1957).

{¶ 42} To establish that CEI calculated its indirect costs in accordance with sound accounting principles, CEI points to its compliance with FERC and PUCO regulations. Bosemann does not dispute that CEI satisfied its burden to demonstrate sound accounting principles but contends that compliance with regulations is insufficient to meet the second requirement — that CEI calculated indirect damages with reasonable certainty. Bosemann cites to *CG&E Co. v. Brock*, 1st Dist. Hamilton No. C830187, 1983 Ohio App. LEXIS 11225, 9-10 (Dec. 21, 1983) to highlight the distinction between the concepts of accounting and damages. We agree with Bosemann that CEI's compliance with sound accounting principles does not also satisfy its burden to establish indirect costs with reasonable certainty. *See Royer* at ¶ 31 ("[S]imply proving that its indirect costs were calculated in compliance with FERC and PUCO regulations does not, in itself, satisfy Ohio Edison's burden of proof."). Thus, we must look to evidence other than compliance with FERC and PUCO when reviewing whether CEI established its indirect costs with reasonable certainty.

**{¶ 43}** Bosemann argues that CEI failed to establish its indirect costs with reasonable certainty because Weaver was not familiar with FERC or Ohio damages law and could not testify that compliance with FERC "results in indirect costs calculated with reasonable certainty." Bosemann further argues that Weaver's testimony as to how CEI calculates its indirect costs does not demonstrate reasonable certainty. Bosemann points out that Weaver assumed that a project with higher direct cost requires more indirect support but that he was not aware of any studies to confirm that assumption. Bosemann thus contends that CEI presented no evidence to show that its allocation of indirect costs "bears any accuracy to the costs truly incurred as a result of that project." Bosemann's expert witness, Hock, also opined that CEI's approach to calculating indirect costs is appropriate for general accounting purposes but is insufficient for calculating damages because CEI did not provide sufficient information to determine whether Bosemann's negligence proximately caused the indirect damages included in CEI's claim. Lastly, Bosemann maintains that CEI's indirect costs include attorney fees that are not recoverable under Ohio law because administrative costs include CEI's legal support group, Weaver acknowledged that no legal support was necessary to replace the utility pole at issue other than this litigation, and Weaver's time spent testifying at trial would be included in the accounting department's indirect costs.

**{¶ 44}** As an initial matter, we are not persuaded by Bosemann's attorney-fees argument. No evidence shows that the attorney fees CEI incurred from this lawsuit were included in the administrative costs or that CEI was attempting to

charge Bosemann directly for its legal fees. Likewise, there was no evidence that Weaver's time at trial is being charged directly to Bosemann. Weaver testified that CEI's internal legal expenses are included in the indirect costs, including his time testifying at trial. "Legal and accounting expenses" may be included in indirect costs, which are proper damages if they are proven with reasonable certainty and are in accordance with sound accounting principles. *Burns*, 2014-Ohio-502, at ¶ 6, quoting *Complete Gen. Constr. Co. v. Ohio DOT*, 94 Ohio St.3d 54, 760 N.E.2d 364 (2002).

{¶ 45} The Second, Sixth, Ninth, and Eleventh Districts have found that the multiplier method did not determine indirect costs with reasonable certainty. *See Dayton Power & Light Co. v. Puterbaugh,* 2d Dist. Miami No. 79 CA 13, 1980 Ohio App. LEXIS 13648, 8 (Mar. 7, 1980) (finding no connection between the damaged utility pole and the salaries of clerks, superintendents of construction, and other personnel); *Soule*, 6th Dist. Sandusky No. S-17-052, 2018-Ohio-4624, ¶ 35 (finding no direct and proximate causal nexus between the utility's indirect costs of running its business with the damage actually caused to the utility pole); *Houser,* 6th Dist. Erie No. E-17-063, 2018-Ohio-4156, at ¶ 23-25 (utility did not present evidence that it tracked the actual indirect costs for the specific utility pole at issue); *Toledo Edison Co. v. Czajka*, 6th Dist. Lucas No. L-02-1393, 2003-Ohio-3684, ¶ 7 (utility's witness had assumed without support that there was a direct relationship between the indirect costs attributed to overhead expenses and the direct costs for labor per construction project); *Teply*, 6th Dist. Lucas No. E-02-022, 2003-Ohio-1417, ¶ 33

(utility's accountant did not know the amount of overhead costs that were required for the pole replacement at issue); *Royer*, 2018-Ohio-75, 92 N.E.3d 912, at ¶ 31-32 (utility did not establish indirect costs with reasonable certainty because the annual study from which the percentage was determined considered construction projects outside of utility pole repairs); *Ohio Edison Co. v. Beavers*, 11th Dist. Trumbull No. 96-T-5568, 1997 Ohio App. LEXIS 2830 (June 27, 1997) (utility's accountant could not state what support services had been used for the particular job at issue).

{¶ 46} However, this court has held that evidence like what CEI presented at trial here was sufficient to prove indirect costs to a reasonable degree of certainty. *Burns*, 8th Dist. Cuyahoga No. 100235, 2014-Ohio-502, at ¶ 13. In *Burns*, the trial court granted summary judgment in favor of CEI and awarded indirect costs for the replacement of the utility pole that Burns had damaged. *Id.* at ¶ 3. On appeal, Burns argued that CEI failed to prove its damages to a reasonable degree of certainty. *Id.* at ¶ 5. CEI submitted a CREWS work summary and claim invoice that showed the equipment, material, and labor costs to repair the pole, which values were substantiated by a CEI accountant and a CEI construction supervisor. *Id.* at ¶ 10. The CEI accountant testified at his deposition that a multiplier charge is added to all invoices to represent support functions including information technology, human resources, accounting, and legal. *Id.* at ¶ 12. He explained that the accounting department determines the multiplier for support groups based on cost data from the year before, which is reviewed annually and audited by internal and external auditors. *Id.* at ¶ 13. This court held that CEI's evidence was "sufficient to

demonstrate that the total repair costs listed in [CEI's] invoice were determined to a reasonable degree of certainty." In a nearly identical case, the Eleventh District relied on *Burns* to hold that CEI met its burden on summary judgment that it was entitled to recover its indirect damages. *Wiser*, 2018-Ohio-2248, 114 N.E.3d 240, ¶ 46 (11th Dist.).

{¶ 47} Here, CEI submitted as evidence a CREWS work summary showing the equipment, material, labor, and vehicle charges; an invoice from the claims department showing the material, labor, equipment, and miscellaneous costs, both direct and indirect charges; and an analyst costs summary showing direct charges from the mobile data terminal as well as administrative charges for labor, transportation, and material. Even though Weaver was not actually familiar with FERC guidelines or Ohio damages law, Weaver testified that CEI determines indirect costs by a study measuring the cost of operating FirstEnergy's business, including support services from information technology, human resources, executive leadership, and accounting and legal support groups. Weaver testified that the indirect costs are applied to the direct cost of each construction job. To calculate CEI's overhead, FirstEnergy takes the total cost of its support groups and divides it by the total cost of all construction work. FirstEnergy multiplies the resulting percentage, which in this case was 12.3 percent, by the direct costs for a specific project to determine the overhead costs for that project. That amount is then added to the cost of the project. Weaver testified that the cost data used to determine indirect costs is reviewed annually and audited internally and externally.

{¶ 48} Weaver further testified that support services used for utility pole repairs cannot be separated from that for other types of construction projects. The employees who replace utility poles are part of FirstEnergy's general construction services department and are not dedicated solely to pole repair. He testified that FirstEnergy's human resources department does not provide separate training to employees performing pole repairs as opposed to other construction services. The information technology department performs the same support services whether the construction crew is replacing a pole or working on another construction job.

{¶ 49} Despite cases in other districts that found the evidence insufficient to establish indirect costs with reasonable certainty, we must follow the precedent of this court. In *Burns*, we found that evidence nearly identical to the evidence in this case was sufficient to prove indirect costs to a reasonable degree of certainty. We therefore find that here, CEI proved its indirect costs to a reasonable degree of certainty, and the trial court did not err in holding so. Accordingly, we overrule Bosemann's second and final assignment of error.

{¶ 50} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, A.J., and
RAYMOND C. HEADEN, J., CONCUR